# EXHIBIT 1

## (DECLARATION OF PAUL S. MIN)

## TO

## WI-LAN'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | |
|---|---|
| WI-LAN USA, INC. AND WI-LAN INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Case No. 1:12-CV-23568-CMA |
| vs. | ) |
| | ) |
| ALCATEL-LUCENT USA, INC., | ) Jury Trial Demanded |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DECLARATION OF PAUL S. MIN**
**IN SUPPORT OF WI-LAN'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

I, Paul S. Min, Ph.D., submit this Declaration pursuant to 28 U.S.C. § 1746 and declare as follows:

**Introduction**

1. I have personal knowledge of the facts stated in this Declaration, and if called upon as a witness, could and would testify competently thereto.

2. I have been retained as an expert in the above-captioned action on behalf of Plaintiffs Wi-LAN USA, Inc. and Wi-LAN Inc. ("Wi-LAN").

3. I am being compensated at my customary hourly rate, and my compensation is not contingent on the outcome of this proceeding.

4. My qualifications for forming the opinions set forth in this Declaration are summarized here and explained in more detail in my *curriculum vitae* which is attached as Exhibit A. Exhibit A also includes a list of my publications and of prior testimony I have given.

5. I received a B.S. degree in Electrical Engineering in 1982, an M.S. degree in Electrical Engineering in 1984, and a Ph.D. degree in Electrical Engineering in 1987 from the

US 1974602

University of Michigan in Ann Arbor. While I was at the University of Michigan in Ann Arbor, I received several academic honors, including my B.S. degree with honors, a best graduate student award and a best teaching assistant award during my M.S. studies, and a best paper award from a major international conference for reporting results from my Ph.D. thesis.

6. After receiving my Ph.D., I worked at Bellcore in New Jersey from August 1987 until August 1990.

7. In September 1990, I joined the faculty at Washington University in St. Louis. I was an Assistant Professor of Electrical Engineering until June 1996. In July 1996, I was promoted to an Associate Professor of Electrical Engineering with tenure. Since July 2002, I have been an Associate Professor of Electrical and Systems Engineering at Washington University.

8. At Washington University, I have conducted research in communication, computing, and related electronic hardware and software. My research group has pioneered a new paradigm for designing electronic circuits that can alleviate the speed and performance mismatch against optical technology. I received several grants from the U.S. Federal Agencies, including the National Science Foundation and the Defense Advanced Research Project Agency, and numerous contracts from the companies and organizations around the world.

9. As a faculty member at Washington University, I have taught a number of courses in electronics, communication, and computing at both the undergraduate and graduate levels. I have supervised more than 50 students, 12 of whom received a doctoral degree under my guidance.

10. In addition to my responsibilities as a university faculty member, I have founded two companies. In May 1997, I founded MinMax Technologies, Inc., a fabless semiconductor

company that developed switch fabric integrated circuit chips for the Internet.  In March 1999, I founded Erlang Technology, Inc., a fabless semiconductor company that focused on the design and development of integrated circuit chips and software for the Internet.  One of Erlang's products has received a best product of the year award in 2004 from a major trade journal for the electronics industry.

11. Since founding MinMax Technologies, Inc. and Erlang Technology, Inc., I have served as the president for these companies for a number of years.  As the president of these companies, I have managed the development of business plans, raised startup funding from private investors and corporations and follow-on investment from institutional investors, managed finances, recruited key technology and business employees, developed intellectual property, and handled the marketing and sales of products.  I have managed MinMax and Erlang in various stages, starting from just a few employees to over 70, and raised over US $30 million in investment.

12. Outside my own start-up companies, I have also served in various technology and business advisor roles for other companies and organizations around the world.  I was the main technical author for one of two winning proposals to the Korean government for CDMA wireless service licenses (1996).  I have also been involved in a semiconductor company that specializes in semiconductor memories such as flash EEPROMs as a board member and as a technical advisor (2007 - 2011).

13. I am a named inventor on nine U.S. patents.  I have extensively published technical papers in international conferences and journals, technical memoranda and reports, and given a number of seminars and invited talks.  I have organized several international conferences and served as an international journal editor.

14. I have received several professional awards, such as the Best Paper Award at Mobility 2011 Conference in Barcelona, Spain (2011), the faculty advisor to the Most Active Student Branch in the Region 5 of the Institute of Electrical and Electronics Engineers (the "IEEE") (2009), the Wall Street Journal Businessmen of Year for Missouri (2003), the Outstanding Achievement Award by Bellcore (1990), the Best Paper Award at the 18th ISATA Conference in Florence Italy (1988), Rockwell Fellowship by Rockwell International (1985 and 1986), Outstanding Graduate Student Award by the University of Michigan (1985), and Outstanding Teaching Assistant Award by the University of Michigan (1984 and 1986).

15. I am a member of and have been actively involved in a number of professional organizations. For example, I am a Senior Member of the IEEE, the Vice Chair and the Chair-Elect of the Saint Louis Section of the IEEE, an Ambassador of the McDonnell International Scholars Academy, and a member of the Eta Kappa Nu Honor Society for electrical engineers.

16. I am knowledgeable about and familiar with wireless and telecommunications systems industry standards, and have authored papers that the application of these standards in optimizing the design and testing of wireless and telecommunications systems. I am also knowledgeable and familiar with microprocessor architecture and associated software and firmware design for wireless and telecommunications terminals and base stations.

**Scope of My Work**

17. I have been asked by Wi-LAN to provide an opinion relative to certain claim construction and indefiniteness issues raised by the parties. In response, I have reviewed United States Patent No. 8,027,298 ("the '298 Patent"), United States Patent No. 8,249,014 ("the '014 Patent"), and United States Patent No. 8,229,437 ("the '437 Patent") (collectively, the "Patents-In-Suit") along with the prosecution histories for the Patents-In-Suit to determine how a person of ordinary skill in the art on or around the relevant point in time for each patent family would

understand the meanings of the terms, in light of the specification of each patent family and their respective disclosures.

**Ordinary Skill**

18. In my opinion, one of ordinary skill in the art of the Patents-In-Suit would have a four-year degree in Electrical Engineering, Computer Engineering, or closely related fields, with some experience in wireless communications or associated technologies.

19. I understand that the "relevant point in time" for analyzing the perspective of a person of ordinary skill in the art is 1998 for the '298 and '014 Patents, and 2006 for the '437 Patent.

20. I have interacted in a professional capacity with several individuals having levels of education and experience similar to those indicated above prior to and within the relevant time frame for each patent family, and am familiar with the curricula used in accredited engineering programs at U.S. universities during these time frames.

**"Bandwidth" terms**

21. The term "bandwidth," as used in the claims of the '298 and '014 Patents and in the context of various communication technologies, would be understood by one of ordinary skill in the art to broadly mean "data transmission resources." For example, traditional analog communication systems, such as broadcast radio or television, use bandwidth to refer to a portion of the frequency spectrum (measured in Hertz). *See, e.g.,* Exh. B, IEEE STANDARD GLOSSARY OF COMPUTER NETWORK TERMINOLOGY ¶ 3.58, p. 5 (1995) (defining "bandwidth" as "the range of frequencies, expressed in hertz, that can pass over a given channel"). Other systems, such as a Code Division Multiple Access ("CDMA") cellular communication system, refer to bandwidth in terms of available codes. *See* Exh. C, Regis J. "Bud" Bates, GPRS: GENERAL PACKET RADIO SERVICE, at p. 40 (McGraw-Hill 2002). Yet other systems refer to bandwidth in terms of bits or

5

bytes. *See* '298 Patent at 12:26–30; Exh. D, IEEE 802.16 STANDARD, pp. 40, 41 (2001) (describing "Bandwidth Request" as the "number of bytes of uplink bandwidth requested by the SS [Subscriber Station]").

22.   I have not seen anything in the intrinsic evidence of the Patents-In-Suit to limit bandwidth to "in a particular time period."  In contrast, the specification discloses that "both the TDD and FDD [frequency division] duplexing schemes are well known in the art" and can be used "[d]epending on the design criteria of a given system."  '298 Patent at 1:52–59.  In an FDD system, the "uplink" portion is not restricted to a particular time period.  Rather, the base station can transmit data (downlink) and receive data (uplink) at the exact same time from a subscriber unit, because the two directions of communication are separated by frequencies rather than time.

**UL Queue**

23.   One of ordinary skill in the art would understand that a "UL queue," as used in the claims of the '298 and '014 Patents, is not limited to a "particular QoS level" but can instead relate to multiple QoS levels.  For example, the specification refers to Data Pending, Guaranteed Rate, and Average Rate.  *See* '298 Patent at 19:65–20:5.  One of ordinary skill in the art would know that each of these are examples of QoS parameters.  Further, one of ordinary skill in the art would understand that connections within a given UL queue can have different Guaranteed Rate and Average Rate parameters, for example, such that not all of the data within a given UL queue relate to a "particular QoS level."

**Connections established at the subscriber unit**

24.   The term "connections established at the subscriber unit" is not insolubly ambiguous.  One of ordinary skill in the art would understand the meaning of this term within the context of the claims of the '298 patent.  A connection is used to provide services operating on a subscriber unit.  In some embodiments described in the '298 and '014 patents, a subscriber unit

6

may request bandwidth for a service, which is one type of connection. '298 patent at 17:34–47. In other embodiments, a subscriber unit may have multiple connections to provide multiple services. '298 patent at 12:46–47. A connection ID is used to establish the identity of each connection. '289 patent at 12:46–47. A subscriber unit may also request bandwidth for a UL queue, rather than for a specific connection. '298 Patent 22:48–54. Regardless of whether the bandwidth is requested for a UL queue or for a connection, once the base station allocates the bandwidth to the subscriber unit, the subscriber unit distributes the bandwidth among its connections. '298 Patent 4:34–48.

25. The '298 patent is also clear about the role of connections and queues. The '298 patent states that "[f]air weighted queuing requires that all connections at a given QoS have a weight, assigned to them to determine the percentage of the available bandwidth they are eligible to receive. This weight value is preferably derived from one of three data rate parameters, depending upon the contractual parameters of the provisioned connection. These three parameters are: (1) Data Pending; (2) Guaranteed Rate; and (3) Average Rate." '298 patent, 19:65–20:5. One of ordinary skill in the art would have understood that parameters such as the Guaranteed Rate and the Average Rate are associated with a connection that characterizes a particular service. For example, a certain video service may require a guaranteed minimum rate of 50Kbps and an average rate of 100 Kbps, and another data service may require an average rate of 1Mbps but require no guaranteed rate. As the above excerpt from the '298 patent states, one or more connections with different bit rate requirements, thus having different QoS requirements, can be organized in a single QoS queue with different QoS requirements. *See id.* at 20:42–52 (referring to distributing bandwidth "across the connections in the queue"). To one of ordinary skill in the art, the meanings of the terms "connection[s]," "connections established at the

7

subscriber unit," "groups of connections," and "queue" in the '298 and '014 patents are clear and would not lead to any confusion. The '298 patent uses these terms according to their plain and ordinary meanings in the art.

**Random Access Identifier**

26.  One of ordinary skill in the art would understand that a "random access identifier," as used in the claims of the '437 patent, is used to uniquely identify a mobile station, but is *not* used "to modulate data that is to be transmitted over a random access channel." The specification states that the "subscriber station 130a can *modulate the subcarriers* of the random access channel with the selected code using a predetermined modulation type, for example, BPSK," ('437 Patent at 5:36–39). The modulation of subcarriers in the above excerpt from the '437 Patent refers to the mapping of binary 1s and 0s to physical signals such as sine waves and cosine waves (e.g., binary phase shift key modulation or "BPSK"). This simply means that the selected code, which comprises a sequence of 1s and 0s are transmitted in certain analog waveforms according to a predetermined modulation type such as BPSK. Random access identifiers are not used to modulate any "data that is to be transmitted over a random access channel." This is an entirely different concept that is used, for example, for data spreading in W-CDMA and other technologies, and is not discussed in the '437 patent.

27.  ALU claims that "only a code used to actually modulate the data can be detected immediately upon receipt" and "only a code used to modulate data is identifiable without decapsulation." ALU Br. at 21. These statements are not correct, because many binary sequences, which are not codes used to modulate data, can still be detected immediately upon receipt and are identifiable without decapsulation. For example, a bit sequence $0^j1$, that is j-consecutive 0s followed by a 1, is commonly used as a flag to delimit the boundaries between two successive data frames. With properly implemented bit-stuffing, this data sequence, which

8

is a code indicating the frame boundaries, is (and must be) detected immediately upon receipt and is identifiable without decapsulation.

**"Feedback message" terms**

28. I have reviewed the portions of the '437 patent file history cited by ALU. I understand that ALU is attempting to insert "network identifier" into the construction of a larger phrase including "feedback message" based on statements made by the applicants in the file history. I believe that ALU is misconstruing the applicants' statements.

29. The pertinent claim element upon which the applicants' responses in the file history are premised is "synchronizing based on a feedback message generated upon receiving a random access identifier on the random access channel." The examiner compared a C-RNTI (a "network identifier") to the random access identifier of the '437 patent claims, but the applicants noted that the two were not similar. *See* Exh. E, '437 File History, Mar. 18, 2012 Reply Pursuant to 37 C.F.R. § 1.111, at 17. The applicants went on to say that the prior art disclosed only a C-RNTI, such that if the C-RNTI were not a random access identifier, the above claim element could not be met since there was no random access identifier. *Id.* Even so, the applicants argued that "[a]ssuming, *arguendo*, that a C-RNTI could amount to the claimed random access identifier, which, for at least the reasons set forth above, applicants submit it cannot, [the prior art] *teaches away* from using a C-RNTI for handover synchronization in a manner such as set forth in the claims, by failing to transmit a C-RNTI until after synchronization (see Step 4-10)." *Id.* at 16.

30. Thus, the applicants were saying that even if a C-RNTI were hypothetically considered to be a network identifier, the feedback message used for synchronization could not be generated upon receiving a C-RNTI since the prior art taught that the C-RNTI was not sent until after synchronization. In my opinion, the applicants did not at all discuss whether the C-

9

RNTI (or any other network identifier) was transmitted in or along with the feedback message. Thus, I disagree with ALU's characterization of applicants' statements.

**Processor [module] configured to**

31. The IEEE Computer Society defines the term "processor" to mean "(1) A device that interprets and executes instructions, consisting of at least an instruction control unit and an arithmetic unit. See also: coprocessor; preprocessor. (2) A device that contains a central processing unit." Exh. F, IEEE STANDARD GLOSSARY OF COMPUTER HARDWARE TERMINOLOGY, IEEE STD 610.1 0-1994 ¶ 3.1731, page 73 (IEEE: 1994). The IEEE also defines the term "central processing unit" or "CPU" to mean "[t]hat unit of a computer system which fetches, decodes and executes programmed instructions and maintains the status of results as the Program is executed." *Id.* at ¶ 3.296, page 15.

32. Based on these definitions, it is clear to one of ordinary skill in the art that in order for a processor, which includes a CPU, to interpret and executes instructions, the processor must have a memory to store the status of results as the program is executed. Thus, to one of ordinary skill in the art, the CPU with memory does not add any additional insight to the meaning of the term "processor."

33. Having reviewed the specifications and the claim language, one of skill in the art would understand the structure that is claimed as "processor [] configured to" and "module configured to."

I declare under penalty of perjury that the foregoing is true and correct.

Executed July 17, 2013.

_____

Paul S. Min, Ph.D.